CORWIN L. HULBERT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hulbert v. Comm'r
Docket No. 2536-70
United States Tax Court
T.C. Memo 1973-221; 1973 Tax Ct. Memo LEXIS 66; 32 T.C.M. (CCH) 1024; T.C.M. (RIA) 73221; October 9, 1973, Filed *66 Corwin L. Hulbert, pro se. Robert J. Murray, *67 for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in Federal income taxes and additions to tax against the petitioner as follows: Additions To Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a) 1962
$5,320.37
$1,330.09
$266.02
1965
1,355.32
432.82
117.31
Several issues raised in the pleadings have been abandoned by the petitioner and can be given effect in the Rule 50 computation. There are several issues remaining to be decided. 2 (1) Whether respondent correctly reconstructed the petitioner's adjusted gross income by use of the net worth plus nondeductible expenditures method; (2) Whether the petitioner is liable for additional self-employment tax in the amount of $77.09 for the taxable year 1965; (3) Whether the petitioner is liable for additions to the tax under section 6651(a), and (4) Whether the petitioner is liable for additions to the tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated *68 and are so found. [2]
Corwin L. Hulbert, hereinafter called Hulbert or petitioner, is an individual who at the time the petition in this case was filed resided in Lincoln, Nebraska. The petitioner filed Federal income tax returns for the taxable years 1962 and 1965 with the district director of internal revenue, Omaha, Nebraska. 3 The petitioner's Federal income tax return for the taxable year 1962 was received by the Lincoln, Nebraska office of the internal revenue on January 29, 1965. The Federal income tax return which the petitioner filed for the taxable year 1965 was received on August 12, 1966. During the taxable years 1962 and 1965 the petitioner owned and operated a farm of approximately 400 acres near Yates Center, Kansas, and another farm containing approximately 80 acres located in Saunders County, Nebraska. During December 1964 petitioner signed a contract for the purchase of an additional *69 60 acres of Saunders County real property. During the taxable year 1965 the petitioner sold his entire farm located in Saunders County, Nebraska, for a total consideration of $24,500. During the years in issue petitioner had an interest in and managed several residential apartment units in Lincoln, Nebraska. Petitioner failed to maintain adequate books and records of his income and expenditures during the years in issue. Respondent determined petitioner's adjusted gross income by using the net worth plus nondeductible expenditures method as follows: 4 Respondent's Net Worth Schedule
ASSETS
1/1/62
12/31/62
1. National Bank of Commerce,
$ (195.23)
$ 820.88
Lincoln, Nebraska
2. The State Exchange Bank,
19.44
19.44
Yates Center, Kansas
3. State Federal Savings &
-
7,100.00
Loan, Lincoln, Nebraska
4. First Federal Savings &
-
10,100.00
Loan, Lincoln, Nebraska
5. Machinery and Equipment
3,987.50
3,987.50
6. Real Estate:*
a. 3145 Kleckner Ct.
$ 6,000.00
$ 6,000.00
b. 2325 South 10th St.
5,647.15
5,962.15
c. 2115 H Street
4,183.26
4,183.26
d. 2901 No. 11th St.
5,879.70
5,879.70
e. 3021 T Street
6,231.50
6.231.50
f. 1727 So. 27th St
6,655.34
6,655.34
g. 114 L Street
-
1,160.26
h. 132 L Street
-
2,968.34
i. 3108 No. 56th St.
-
6,300.33
j. Capitalized Real Property
-
-
Taxes
k. Kansas Farm, Coffey County
5,800.00
5,800.00
1. Nebraska Farms - 80 acres
6,000.00
6,000.00
60 Acres
Total Real Estate
$46,396.95
$57,140.88
7. Pike Contract Receivable
-
3,980.47
TOTAL ASSETS
$50,208.66
$83,149.17
LIABILITIES AND RESERVES
8. Reserve for Depreciation:
a. Farm Machinery & Equipment
$ 3,155.83
$ 3,537.50
b. Real Estate
11,768.85
13,146.91
Total Reserves for
$14,924.68
$16,684.41
Depreciation
9. Notes and Mortgages
Payable:
a. First Federal Savings &
$ 3,471.40
-
Loans
b. Havelock National Bank
8,000.00
13,500.00
c. Lutheran Mutual Aid Ins.
2,849.21
2,101.66
3,198.53
d. Wilscam Contract
3,300.00
3,300.00
e. Commonwealth Co.
4,465.00
9,865.00
f. Christian Note 1,950.00
1,950.00
-
g. The State Exchange Bank
-
-
h. Iola State Bank
-
-
i. Bert Poska Contract
1,162.91
608.47
Total Notes and Mortgages
$25,547.84
$32,072.68
10. Life Insurance Co. Loans
Payable:
a. John Hancock-Mortgage on
4,600.00
4,300.00
Kansas Farm
b. John Hancock-Mortgage on
2,700.00
2,550.00
Nebraska Farm
c. John Hancock-Policy Loans
6,928.24
7,634.84
d. New England Mutual-Policy
1,347.45
1,415.41
Loans
Total Insurance Loans Payable
$15,575.69
$15,900.25
11. Taxes - Payable
-
432.27
TOTAL LIABILITIES
$56,048.21
$65,089.61
12. NET WORTH
($5,839.55)
18,059.56
13. Net Worth Beginning of
5,839.55
Year
14. Increase (decrease) in
23,899.11
Net Worth
15. Plus:
a. Personal Living Expense
$ 3,506.08
b. Life Insurance
1,326.08
c. Child Support Payments
1,433.00
d. Nondeductible Legal and
1,322.38
Court Payments
e. Lump Sum Property
Settlement
16. TOTAL
$31,486.65
17. Less:
a. Government Insurance
$ 57.60
dividends
b. Social Security
1,315.00
c. Hartford Insurance Claim
$ 358.66
(Auto)
d. Basis of One-Fourth
8,000.00
Interest in Oklahoma Farm
e. Nontaxable Portion of
3,214.65
Long-Term Capital Gain
18. CORRECTED ADJUSTED GROSS
$18,540.74
INCOME
19. Adjusted Gross Income Per
(2,707.28)
Return (loss)
20. UNDERSTATEMENT OF
$21,248.02
ADJUSTED GROSS INCOME
*70 Respondent's Net Worth Schedule
ASSETS
1/1/65
12/31/65
1. National Bank of Commerce,
$ 14.43
$ 79.69
Lincoln, Nebraska
2. The State Exchange Bank,
-
-
Yates Center, Kansas
3. State Federal Savings &
5.24
5.24
Loan, Lincoln, Nebraska
4. First Federal Savings &
5.72
5.72
Loan, Lincoln, Nebraska
5. Machinery and Equipment
4,213.51
4,988.51
6. Real Estate:*
a. 3145 Kleckner Ct.
$ 6,000.00
$ 6,000.00
b. 2325 South 10th St.
5,962.15
5,962.15
c. 2115 H Street
4,183.26
4,183.26
d. 2901 No. 11th St.
5,879.70
5,879.70
e. 3021 T Street
6,231.50
-
f. 1727 So. 27th St
7,107.04
7,107.04
g. 114 L Street
1,870.26
1,870.26
h. 132 L Street
2,968.34
2.968.34
i. 3108 No. 56th St.
6,350.90
6,350.90
j. Capitalized Real Property
-
1,305.39
Taxes
k. Kansas Farm, Coffey County
5,800.00
5,800.00
1. Nebraska Farms - 80 acres
6,000.00
-
60 Acres
1,000.00
-
Total Real Estate
$59,353.15
$47,427.04
7. Pike Contract Receivable
3,114.94
2,627.93
TOTAL ASSETS
$66,706.99
$55,134.13
LIABILITIES AND RESERVES
8. Reserve for Depreciation:
a. Farm Machinery & Equipment
$ 3,885.70
$ 4,081.23
b. Real Estate
16,264.02
15,853.89
Total Reserves for
$20,149.72
$19,935.12
Depreciation
9. Notes and Mortgages
Payable:
a. First Federal Savings &
-
-
Loans
b. Havelock National Bank
10,300.00
8,300.00
c. Lutheran Mutual Aid Ins.
1,701.94
3,198.53
d. Wilscam Contract
3,300.00
-
e. Commonwealth Co.
9,865.00
11,883.40
f. Christian Note 1,950.00
-
g. The State Exchange Bank
2,000.00
-
h. Iola State Bank
-
416.00
i. Bert Poska Contract
608.47
608.47
Total Notes and Mortgages
$28,175.13
$22,909.81
10. Life Insurance Co. Loans
Payable:
a. John Hancock-Mortgage on
4,000.00
4,000.00
Kansas Farm
b. John Hancock-Mortgage on
2,550.00
-
Nebraska Farm
c. John Hancock-Policy Loans
9,634.23
9,662.48
d. New England Mutual-Policy
1,672.00
1,727.80
Loans
Total Insurance Loans Payable
$17,856.23
$15,390.28
11. Taxes - Payable
262.53
380.11
TOTAL LIABILITIES
$66,443.61
$58,615.32
12. NET WORTH
263.38
(3,481.19)
13. Net Worth Beginning of
563.38
Year
14. Increase (decrease) in
(4,044.57)
Net Worth
15. Plus:
a. Personal Living Expense
$ 3,122.24
b. Life Insurance
185.17
c. Child Support Payments
1,257.50
d. Nondeductible Legal and
1,091.00
Court Payments
e. Lump Sum Property
-
15,403.08
Settlement
16. TOTAL
$17,014.42
17. Less:
a. Government Insurance
$ 51.60
dividends
b. Social Security
-
c. Hartford Insurance Claim
-
(Auto)
d. Basis of One-Fourth
-
Interest in Oklahoma Farm
e. Nontaxable Portion of
$ 5,601.51
Long-Term Capital Gain
18. CORRECTED ADJUSTED GROSS
$11,361.31
INCOME
19. Adjusted Gross Income Per
1,491.43
Return (loss)
20. UNDERSTATEMENT OF
$ 9,869.88
ADJUSTED GROSS INCOME
*71 7 Disputed Items on the Net Worth Schedule (Item 1) National Bank of Commerce, Lincoln, Nebraska
Petitioner maintained checking account number XXX-XX7-704 at the National Bank of Commerce, Lincoln, Nebraska, during the years in issue. The bank's records reflect a balance of $400.71 in said account as of December 31, 1962. On December 31, 1962, petitioner withdrew $3,000 from his account at the State Federal Savings and Loan Assn. The $3,000 was deposited in checking account number XXX-XX7-704 along with $75 from an undisclosed source. As of December 31, 1962, there were six checks outstanding against checking account number XXX-XX7-704 in the amounts of: Outstanding Checks $ 10.52 3.20 197.45 5.00 4.03 2,434.63 $ 2,654.83 The reconciled balance of Hulbert's account number XXX-XX7-704 was $820.88 as of December 31, 1962, computed as follows: 8 Balance per bank statement
$ 400.71
Plus deposits in transit
3,075.00
$3,475.71
Less outstanding checks
2,654.83
Reconciled balance
$ 820.88
*72 (Items 3 and 4) State Federal Savings and Loan, Lincoln, Nebraska and First Federal Savings and Loan, Lincoln, Nebraska (cashier's check - $24,429.31) Petitioner maintained savings account number X0578 at the Lincoln, Nebraska branch of the State Federal Savings and Loan Assn. of Beatrice, Nebraska, from October of 1962 through December 31, 1965, in the name of Corwin L. Hulbert Motors, Inc. Savings account number X0578 was opened on or about October 9, 1962, with a deposit of $10,000. Petitioner opened account number X0578 by presenting a cashier's check dated December 15, 1961, drawn upon the First National Bank of Sayre, Oklahoma, in the amount of $24,429.31 payable to the order of Sadie Simon or T. R. Wise, attorney for Sadie Simon. The reverse side of the cashier's check bears the name of Sadie Simon (hereinafter sometimes called Sadie), followed by the endorsement of petitioner and the general endorsement of the banks which handled the instrument. After the deposit of $10,000 in savings account number X0578 the remaining $14,429.31 was returned to petitioner by means of a check for that amount. 9 Petitioner also maintained savings account number X5008 at *73 the First Federal Savings and Loan Assn. of Lincoln, Nebraska, from October of 1962 through December 31, 1965, in the name of Corwin L. Hulbert Motors, Inc. On or about October 10, 1962, petitioner opened savings account number X5008 by presenting a check dated October 9, 1962, which had been issued by the State Federal Savings and Loan Assn. of Lincoln, Nebraska, in the amount of $14,429.31 payable to the order of Corwin L. Hulbert. Savings account number X5008 was reduced to a balance of $5.72 on December 31, 1965, by 16 withdrawals. All withdrawals from savings account number X0578 and X5008 were made by petitioner. The proceeds from the aforementioned check for $24,429.31 that were used to open savings account number X0578 and number X5008 resulted from a sale of a farm in Beckham County, Oklahoma by Sadie. On or about September 8, 1961, Sadie sold to Jim T. McDonald, and others, and J. Douglas McDonald, and others, for the sume of $27,000.00 a farm which she owned in Beckham County, Oklahoma. 10 Sadie was Hulbert's aunt (his mother's sister). She had never been married. Prior to the fall of 1962, she lived in Tulsa, Oklahoma with her brother, who died in *74 1958. Prior to the taxable years involved, Hulbert visited Sadie in Tulsa, Oklahoma several times and on such occasions he helped pay her bills, buy her new eyeglasses, a hearing aid and took Sadie to her doctor for treatment. Sadie had been employed by petitioner for an unspecified period of time during the early 1950's at Corwin L. Hulbert Motors, Inc. Sadie was the owner of record of the aforesaid farm in Beckham County which was sold in September 1961. Sadie was in need of medical care at the time the farm was sold. After the real property was sold, she placed herself in a rest home in Tulsa, Oklahoma. In the fall of 1962, Hulbert removed Sadie from the rest home and took her to Lincoln, Nebraska to live in his home. As noted hereinafter she then endorsed the cashier's check in the amount of $24,429.31 and transferred it to Hulbert; and he then deposited the proceeds of said check in savings accounts numbered X0578 and X5008. Petitioner made out a check dated October 25, 1962 payable to Nina Cooper, owner of the rest home, in the amount of $665.55 to pay for Sadie's final bill. 11 Sadie resided with petitioner for an unspecified period of time during the early *75 1950's and from August 1962 until she passed away on December 21, 1963. The respondent determined that the petitioner had a one-fourth interest in the Beckham County farm. Following Sadie's death Merle Simon, the administrator of Sadie's estate, instituted a civil action, Docket 237, Page 288, against petitioner in the District Court of Lancaster County, Nebraska, to recover the proceeds resulting from the sale of the Beckham County farm. In paragraph 3 of the petition and praecipe filed in Docket 237, Page 288, the administrator alleged: [3] 12 That the said proceeds were the property of Sadie Simon and that the defendant [the petitioner in this case] had no right, title or interest therein. That, notwithstanding, the defendant appropriated the said proceeds to his own use under claim of right, although in equity and in good conscience the said proceeds rightfully and legally belong to the Estate of Sadie Simon, deceased; and that the defendant has denied plaintiff's claim thereto. *76 After a trial regarding the issue presented in the case of Merle Simon, Administrator of the Estate of Sadie Simon, Deceased v. Corwin L. Hulbert, Docket 237, Page 288, on October 24, 1968, the jury found for "the plaintiff and against the defendant" and fixed the amount of his recovery at $10,000. During a conference with revenue agent Harold Roper and special agent Joseph Beisch on April 13, 1967, the petitioner exercised his constitutional right to remain silent when he was asked about the source of deposits to savings accounts numbered X0578 and X5008. During a conference with revenue agent Roper on September 27, 1967, petitioner again refused to answer questions regarding the source of deposits to savings accounts numbered X0578 and X5008. Respondent determined that $10,000 of the $24,429.31 check was ordinary income to the petitioner and that the remaining $14,429.31 represented his share of the sale proceeds of the Beckham County farm. Respondent determined 13 that petitioner realized a long-term capital gain of $6,429.31 from that sale. (Item 6-1) Nebraska Farms As of January 1, 1962, December 31, 1962, and January 1, 1965, the petitioner had an interest *77 in an 80-acre parcel of real property which is legally described as the Eastern One Half of the Southeast Quarter of Section 30, Township 13 North, Range 6 East of the 6th P.M., Saunders County, Nebraska. Petitioner obtained said 80 acres of land from Henry J. Benes (hereinafter called Benes), during 1953. Petitioner agreed to pay $6,000 for the 80 acres which he purchased from Benes.Benes accepted $4,800 and a 1949 Kaiser automobile in full payment of the agreed upon consideration. (Item 8-b) Reserve for Depreciation The population of the City of Lincoln, Nebraska exceeded 128,000 during the years in issue.
The respondent allocated $1,000 of petitioner's adjusted basis in each of the eight residential properties which he owned to the land, and allowed petitioner depreciation on the remaining amounts. 14 (Item 10-c) Life Insurance Company Loans Payable As of January 1, 1962, December 31, 1962, January 1, 1965, and December 31, 1965, the petitioner owned six ordinary life and endowment insurance policies on his life which had been issued by the John Hancock Mutual Life Insurance Company of Boston, Massachusetts. The policies included Policy No. 4461669, Policy No. *78 3104298, Policy No. 4827444, Policy No. 2932916, Policy No. 4827441, and Policy No. 4827442. The insurer granted various policy loans, including several premium loans, to the petitioner. The aggregate outstanding balances on those loans as of January 1, 1962, December 31, 1962, January 1, 1965, and December 31, 1965, were $6,928.24, $7,634.34, $9,634.43 and $9,662.68, respectively. Policy No. 4656800 was issued by John Hancock Mutual Life Insurance Co. on the life of Corwin C. Hulbert, Juvenile and Corwin L. Hulbert and was in effect during the taxable years involved herein. Corwin C. Hulbert, petitioner's son, became 21 years of age in 1969. The loan record pertaining to Policy No. 4656800 shows that there was a loan placed on the policy on March 14, 1959 in the amount of $281.85; and that on January 18, 1963 the loan had been increased to $354.24. 15 No credit for repayment on the loan was made until May 14, 1971. On January 18, 1963 a loan to pay the premium on the policy in the amount of $31.95 was made to the policyholder by a so-called automatic premium loan (A.P.L.) which prevents the policy from lapsing for lack of payment of premium as long as there is any *79 cash value in the policy. Said loan of $31.95 was made to pay the premium for the previous 6 months of 1962. The aforesaid loan record also shows a loan in the amount of $27.24 was taken from A.P.L. and from dividends paid by the insurer in 1965.
The balance of the loan account of Policy No. XXX6800 as of December 31, 1965 was $544.43. The petitioner paid the premium of $62 on Policy 4656800 during the taxable year 1965. Policy No. 4012429 was issued by John Hancock Mutual Life Insurance Co., on petitioner's life and that of his daughter, Almarie R. Hulbert, "Juvenile" in 1945. A loan record of Policy No. 4012429 shows that a loan of $320.48 was made to petitioner and Almarie on March 8, 1963, and on April 14, 1965 there was a loan in the amount of $392.49. The annual premium on Policy No. 4012429 was $49.96. No policy loans were made to either owner of the policy during the taxable year 1962. A loan of $24.86 was granted against the policy on April 14, 1965. 16 (Item 11) Real Estate Taxes - Payable The petitioner purchased the real property located at 114 L Street, Lincoln, Nebraska, on or about March 20, 1962. In acquiring the real property the petitioner assumed *80 local real estate taxes in the amount of $697.03 which increased his basis in the property by that amount. During March 1962 petitioner also purchased the real property located at 132 L Street, Lincoln, Nebraska. Petitioner assumed an obligation to pay local real estate taxes in the amount of $95.71 which constituted an encumbrance upon the real property at 132 L Street at the time of the purchase. On or about April 13, 1962, the petitioner acquired the real property located at 3108 North 56th Street, Lincoln, Nebraska. In acquiring the property the petitioner assumed an obligation to pay local real estate taxes in the amount of $229.64 which had accrued against the property. Respondent determined that as of December 31, 1962, January 1, 1965, and December 31, 1965 there were unpaid real estate taxes due and owing from the petitioner on various parcels of real estate which he owned in the amounts set forth hereinabove, as well as real property taxes assessed against other property which the petitioner was attempting to acquire, remained due and owing from him in the amounts of $432.27, $262.53 and $380.11, respectively. 17 (Item 15-a) Personal Living Expenses Respondent *81 determined that petitioner incurred and paid personal living expenses for the taxable years 1962 and 1965 in the amounts of $3,506.08 and $3,122.24, respectively. The amounts for personal living expenses included expenditures for food, clothing, housing, utilities, transportation and the usual miscellaneous personal expenses. (Item 15-e) Lump Sum Property Settlement On February 23, 1965, the District Court of Lancaster County, Nebraska, entered a decree of divorce in Docket 223, Page 220, dissolving the bonds of marriage between Verna A. Hulbert and the petitioner. Petitioner and Verna had been married on October 14, 1940, in Sedalia, Missouri. Paragraph 6 of the divorce decree provides: That the plaintiff [Verna] and defendant have by their joint efforts accumulated considerable amount of real estate most of which is in the name of the defendant and that the plaintiff is entitled to alimony in lieu of a division of the real estate and that said alimony should be in the amount of $15,000.00, and that in addition thereto defendant should pay all court costs, plaintiff's attorney fees and expenses and child support and that defendant should be awarded all of the real *82 estate accumulated by the parties during the marriage title to which at this time is in the name of the defendant or the plaintiff and defendant, subject however to the lien of the plaintiff for her alimony judgment herein and that the said plaintiff should make such conveyances 18 to the defendant of this said real estate as shall be necessary, and that the said plaintiff shall be entitled as her own property any and all personal and real property passing to her under the will of her father, Frank L. Donelson and any and all real and personal property passing to her from the estate of Minnie M. Donelson and the defendant should make such conveyances, if any, that may be requested by the said plaintiff. That the said plaintiff should be entitled to all of the household furniture and equipment and any and all of her personal items and the defendant shall be entitled to and have any and all of his personal items including any automobiles now owned by him. In order to satisfy the $15,000 obligation imposed upon him by the divorce decree, petitioner was obliged to sell the 140-acre farm which he owned in Saunders County, Nebraska. The real estate closing for the sale took place *83 on or about September 17, 1965. Fifteen thousand, four hundred and three dollars and eight cents ($15,403.08) of the sale proceeds were paid to the Clerk of the District Court for Lancaster County, Nebraska and a Satisfaction of Judgment was filed. Self-Employment Taxes for 1965 On Schedule F-1 of his income tax return for the taxable year 1965, petitioner reported that he was liable for self-employment tax in the amount of $182.11. During the taxable year 1965 $4,800 was the largest amount of combined wages and self-employment earnings subject to section 1401. The self-employment tax on $4,800 was 19 $259.20 for the taxable year 1965. Respondent determined that the petitioner was liable for self-employment tax in the amount of $77.09 in addition to the amount reflected on his return for the taxable year 1965 ($259.20 - $182.11 = $77.09). OPINION Use of Net Worth and Expenditures Method Respondent reconstructed petitioner's income tax for each of the taxable years 1962 and 1965 by use of the increase in net worth plus nondeductible expenditures method, and determined that petitioner understated his adjusted gross income for 1962 and 1965 in the amounts of $21,248.02 *84 and $9,869.88, respectively. At the threshold of our discussion of the issues involved herein, we note that petitioner does not appear to contest seriously respondent's right to resort to the comparative net worth plus expenditures method in reconstructing his taxable income for the years involved herein. Petitioner's primary objection is to the effect that he received a cashier's check in the amount of $24,429.31 from his aunt, Sadie Simon, in 1962 which the respondent, in reconstructing petitioner's income for the taxable year 1962, determined he "misappropriated" during that year, and that the balance ($20,000) of the cashier's check deposited in petitioner's bank accounts as of December 31, 1962 was sufficient in 20 amount to account for much of the alleged unreported income in that year. In the same vein, petitioner avers that respondent indulged in guesswork and unfounded inferences with respect to several other material items in the net worth schedule and that the net worth method, when properly applied to the facts of record, establishes that petitioner fully reported his taxable income for the period in question. We have considered so frequently the circumstances *85 under which application of the net worth and expenditures method is appropriate that an extended discussion here would serve no useful purpose. Succinctly, the evidence shows that petitioner's books and records for the taxable years under review were scant, highly inadequate, or unavailable. Obviously, petitioner's difficulty is of his own making in failing to maintain proper records of his business activities and other facts material to the determination of his income tax liability. An examination of our findings demonstrates that the use of the net worth method by the respondent was fully justified as a test of the accuracy of the petitioner's income tax returns and also as significant evidence of his correct net income. Carmack v. Commissioner, 183 F.2d 1 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court, certiorari denied, 340 U.S. 875 (1950); Frank Imburgia, 22 T.C. 1002 (1954). 21 By a showing of a substantial increase in net worth in excess of reported income without reasonable explanation of such discrepancy as being attributable to loans, gifts or other nontaxable receipts, the net worth method furnishes persuasive *86 evidence of unreported income and reflects on the overall accuracy of income reported on the books and on the returns. Holland v. United States, 348 U.S. 121 (1954); Schroeder v. Commissioner, 291 F.2d 649 (C.A. 8, 1961), certiorari denied 368 U.S. 985 (1962); Bodoglau v. Commissioner, 230 F.2d 336 (C.A. 7, 1956); Michael Potson, 22 T.C. 912 (1954); Estate of George L. Cury, 23 T.C. 305 (1954); Harry Gleis, 24 T.C. 941 (1955), affd. 245 F.2d 237 (C.A. 6, 1957). On the basis of the foregoing discussion, we approve respondent's use of the method in the case before us; J. K. Vise, 31 T.C. 220 (1958), affd. 278 F.2d 642, 643 (C.A. 6, 1960). Understatements of Income Initially, we discuss the burden of proof as to the deficiencies to avoid repetition as we progress. The burden of proof rests with petitioners to show error in respondent's determination of deficiencies. In American Pipe & Steel Corp. v. Commissioner, 243 F.2d 125 (C.A. 9, 1957), affirming this Court's opinion at 25 T.C. 351, the Court of Appeals said, in *87 part: 22 Petitioner having invoked the jurisdiction of the Tax Court, entered the hearing burdened with the duty of establishing by at least a preponderance of the evidence that the determination made by the Commissioner was erroneous. Also, we note that even where a taxpayer refutes one or more specific items in a net worth statement, the respondent's determination will not lose its presumption of correctness except with respect to the particular items successfully attacked. Banks v. Commissioner, 322 F.2d 530, 548 (C.A. 8, 1963). In Cefalu v. Commissioner, 276 F.2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court, the Court of Appeals said, in part: A determination of tax liability made by the Commissioner is presumptively correct; the burden is on the taxpayer to prove it erroneous.* * * If the taxpayer shows that part of the Commissioner's determination was wrong, it does not destroy the presumption of correctness that attaches to his findings. Anderson v. Commissioner, 5 Cir. 1957, 250 F.2d 242 certiorari denied 356 U.S. 950, 78 S. Ct. 915, 2 L. Ed. 2d 844. To the same effect see Clark v. Commissioner, 266 F.2d 698 *88 (C.A. 9, 1959) and Hoffman v. Commissioner, 298 F.2d 784 (C.A. 3, 1962), both of which affirmed in whole or in part Memorandum Opinions of this Court. On the basis of the foregoing discussion, we hold that a finding by us against respondent with respect to one or more items comprising his overall determination 23 of deficiencies still leaves on the petitioner the burden of demonstrating with respect to each other item that respondent was wrong; or that respondent's determination was arbitrary or invalid. Respondent's net worth schedule contains, inter alia, approximately 20 items and many of these items are either stipulated, conceded, or uncontested. However, petitioner contends that respondent's net worth statement is overstated in several material respects. Our own practical approach to a resolution of the issues presented is to consider those items of the net worth statement with respect to which the petitioner expressly disagrees, together with those which evolve upon a consideration of the record as a whole. The remaining items, with respect to which the petitioner has failed to point out error and has not met the burden of proof, will be reflected in *89 our ultimate determinations, but will not be separately or specifically considered. Although we approve the use of the net worth expenditures method to determine petitioner's income, we hold that petitioner has, in part, met the burden of proof of error in respondent's determination. Schedule II represents our reconstruction of respondent's computation of income in net worth for the taxable years involved herein for petitioner. Disputed 24 items are indicated by the letter "d." Items without designation are either stipulated, conceded or uncontested. 25 Schedule II
Reconstruction of Income for the Taxable Years 1962 and
1965 by the
Net Worth and Nondeductible Expenditures Method
ASSETS
1/1/62
12/31/62
d.1. National Bank of
$ (195.23)
$ 820.88
Commerce, Lincoln, Nebraska
2. The State Exchange Bank,
19.44
19.44
Yates Center, Kansas
d.3. State Federal Savings &
Loan, Lincoln, Nebraska
d.4. First Federal Saving &
-
Loan, Lincoln, Nebraska
5. Machinery and Equipment
3,987.50
3,987.50
d.6. Real Estate:*
d.a. 3145 Kleckner Ct.
$ 6,000.00
$ 6,000.00
d.b. 2325 South 10th St.
5,647.15
5,962.15
d.c. 2115 H Street
4,183.26
4,183.26
d. 2901 No. 11th St.
5,879.70
5,879.70
e. 3021 T Street
6,231.50
6,231.50
d.f. 1727 So. 27th St.
6,655.34
6,655.34
d.g. 114 L Street
-
1,160.26
d.h. 132 L Street
-
2,968.34
d.i. 3108 No. 56th St.
-
6,300.33
j. Capitalized Real Property
-
-
Taxes
k. Kansas Farm, Coffey County
5,800.00
5,800.00
d.1. Nebraska Farms -
80 Acres
6,000.00
6,000.00
60 Acres
Total Real Estate
$46,396.95
$57,140.88
7. Pike Contract Receivable
-
3,980.47
TOTAL ASSETS
$50,208.66
$65,949.17
LIABILITIES AND RESERVES
8. Reserve for Depreciation:
a. Farm Machinery & Equipment
$ 3,155.83
$ 3,537.50
d.b. Real Estate
11,768.85
13,146.91
Total Reserves for
$14,924.68
$16,684.41
Depreciation
9. Notes and Mortgages
Payable:
a. First Federal Savings &
$ 3,471.40
-
Loan
b. Havelock National Bank
13,500.00
10,300.00
8,000.00
c. Lutheran Mutual Aid Ins.
3,198.53
2,849.21
d. Wilscam Contract
3,300.00
3,300.00
e. Commonwealth Co.
4,465.00
9,865.00
f. Christian Note
1,950.00
1,950.00
g. The State Exchange Bank
-
-
h. Iola State Bank
-
-
i. Bert Poska Contract
1,162.61
608.47
Total Notes and Mortgages
$25,547.84
$32,072.68
10. Life Insurance Co. Loans
Payable:
a. John Hancock-Mortgage on
4,600.00
4,300.00
Kansas Farm
b. John Hancock-Mortgage on
2,700.00
2,550.00
Nebraska Farm
d.c. John Hancock-Policy
6,928.24
7,666.79
Loans
d. New England Mutual-Policy
1,347.45
1,415.41
Loans
Total Insurance Loans Payable
$15,575.69
$15,932.20
d.11. Taxes - Payable
-
432.27
TOTAL LIABILITIES
$56,048.21
$65,121.56
12. NET WORTH
($5,839.55)
827.61
13. Net Worth Beginning of
5,839.55
Year
14. Increase (decrease) in
6,667.16
Net Worth
15. Plus:
d.a. Personal Living Expense
$ 3,568.08
b. Life Insurance
1,326.08
c. Child Support Payments
1,433.00
d. Nondeductible Legal and
1,322.38
Court Payments
d.e. Lump Sum Property
Settlement
16. TOTAL
$14,316.70
17. Less:
a. Government Insurance
$ 57.60
dividends
b. Social Security
1,315.00
c. Hartford Insurance Claim
$ 358.66
(Auto)
d. Basis of One-Fourth
8,000.00
Interest in Oklahoma Farm
e. Nontaxable Portion of
3,214.65
Long-Term Capital Gain
18. CORRECTED ADJUSTED GROSS
$ 1,370.79
INCOME
19. Adjusted Gross Income Per
(2,707.28)
Return (loss)
20. UNDERSTATEMENT OF
$ 1,370.79
ADJUSTED GROSS INCOME
*90 Schedule II
Reconstruction of Income for the Taxable Years 1962 and
1965 by the
Net Worth and Nondeductible Expenditures Method
ASSETS
1/1/65
12/31/65
d.1. National Bank of
$ 14.43
$ 79.69
Commerce, Lincoln, Nebraska
2. The State Exchange Bank,
-
-
Yates Center, Kansas
d.3. State Federal Savings &
5.24
5.24
Loan, Lincoln, Nebraska
d.4. First Federal Saving &
5.72
5.72
Loan, Lincoln, Nebraska
5. Machinery and Equipment
4,213.51
4,988.51
d.6. Real Estate:*
d.a. 3145 Kleckner Ct.
$ 6,000.00
$ 6,000.00
d.b. 2325 South 10th St.
5,962.15
5,962.15
d.c. 2115 H Street
4,183.26
4,183.26
d. 2901 No. 11th St.
5,879.70
5,879.70
e. 3021 T Street
6,231.50
-
d.f. 1727 So. 27th St.
7,107.04
7,107.04
d.g. 114 L Street
1,870.26
1,870.26
d.h. 132 L Street
2,968.34
2,968.34
d.i. 3108 No. 56th St.
6,350.90
6,350.90
j. Capitalized Real Property
-
1,305.39
Taxes
k. Kansas Farm, Coffey County
5,800.00
5,800.00
d.1. Nebraska Farms -
-
80 Acres
6,000.00
-
60 Acres
1,000.00
-
Total Real Estate
$59,353.15
$47,427.04
7. Pike Contract Receivable
3,114.94
2,627.93
TOTAL ASSETS
$66,706.99
$55,134.13
LIABILITIES AND RESERVES
8. Reserve for Depreciation:
a. Farm Machinery & Equipment
$ 3,885.70
$ 4,081.23
d.b. Real Estate
16,264.02
15,853.89
Total Reserves for
$20,149.72
$19,935.12
Depreciation
9. Notes and Mortgages
Payable:
a. First Federal Savings &
-
-
Loan
b. Havelock National Bank
8,300.00
8,000.00
c. Lutheran Mutual Aid Ins.
2,101.66
1,701.94
d. Wilscam Contract
3,300.00
-
e. Commonwealth Co.
9,865.00
11,883.40
f. Christian Note
-
-
g. The State Exchange Bank
2,000.00
-
h. Iola State Bank
-
416.00
i. Bert Poska Contract
608.47
608.47
Total Notes and Mortgages
$28,175.13
$22,909.81
10. Life Insurance Co. Loans
Payable:
a. John Hancock-Mortgage on
4,000.00
4,000.00
Kansas Farm
b. John Hancock-Mortgage on
2,550.00
-
Nebraska Farm
d.c. John Hancock-Policy
9,656.18
9,714.58
Loans
d. New England Mutual-Policy
1,672.00
1,727.80
Loans
Total Insurance Loans Payable
$17,878.18
$15,442.38
d.11. Taxes - Payable
262.53
380.11
TOTAL LIABILITIES
$66,465.56
$58,667.42
12. NET WORTH
241.43
(3,533.29)
13. Net Worth Beginning of
241.43
Year
14. Increase (decrease) in
(3,291.86)
Net Worth
15. Plus:
d.a. Personal Living Expense
$ 3,122.24
b. Life Insurance
185.17
c. Child Support Payments
1,257.50
d. Nondeductible Legal and
1,091.00
Court Payments
d.e. Lump Sum Property
-
15,403.08
Settlement
16. TOTAL
$17,767.13
17. Less:
a. Government Insurance
$ 51.60
dividends
b. Social Security
-
c. Hartford Insurance Claim
-
(Auto)
d. Basis of One-Fourth
-
Interest in Oklahoma Farm
e. Nontaxable Portion of
$ 5,601.51
Long-Term Capital Gain
18. CORRECTED ADJUSTED GROSS
$12,114.02
INCOME
19. Adjusted Gross Income Per
1,491.43
Return (loss)
20. UNDERSTATEMENT OF
$10,622.59
ADJUSTED GROSS INCOME
*91 28 (Item 1) National Bank of Commerce, Lincoln, Nebraska
For the period ended December 31, 1962, respondent shows under cash on hand (Assets) on his net worth schedule the balance of petitioner's checking account at the National Bank of Commerce, Lincoln, Nebraska (account number XXX-XX7-704) in the amount of $820.88. Although the petitioner disputes said balance in his petition, he did not inform us as to what he contends the correct balance was of that date. Petitioner offered no testimony on this issue. Likewise, petitioner's brother, Donald B. Hulbert, an accountant, who testified with respect to said item did not demonstrate any error in respondent's determination of the balance in question. He testified that the records of the National Bank of Commerce reflected a balance of $400.71 in account number XXX-XX7-704 as of December 31, 1962. On cross examination he admitted that a deposit of $3,075 which was comprised of a $3,000 transfer from petitioner's savings account number X0578 at the State Federal *92 Savings and Loan Assn. and $75 in rental income should be considered. The record shows that a withdrawal of $3,000 was made on December 31, 1962 from either the State Federal Savings and Loan Assn., Lincoln, Nebraska (Item 3 under Assets on the net worth schedule) or from the National Bank of Commerce, Lincoln, account in question. Several days later, on 29 January 3, 1963, a deposit was made in one of petitioner's bank accounts (number X0578) in the amount of $3,075. Respondent maintains that the latter amount was the same money drawn out of the State Federal and Loan Assn. account number X0578 on December 31, 1962 with an additional $75 from rental income. Petitioner, on brief, avers that the $3,075 could have been realized from the sale of cattle or other sources. Donald B. Hulbert acknowledges that the aforementioned $3,000 belongs either in the State Federal Savings and Loan Assn. account or in the account at the State Federal Savings and Loan, Lincoln, Nebraska in the amount of $7,100 as of the year ended December 31, 1962 or from the National Bank of Commerce account as of the end of December 31, 1962 in the amount of $820.88 in calculating petitioner's adjusted gross *93 income for the taxable year 1962. We do not believe that the testimony of petitioner's brother regarding the item in dispute proves respondent's determination to be incorrect. As noted hereinabove, the balance in the National Bank of Commerce (account number XXX-XX7-704) as of December 31, 1962 was $400.71. To said amount, respondent added $3,075 which had been transferred from the State Federal Savings and Loan Assn. account number X0578 (Item 3 on the net worth schedule). 30 After subtracting outstanding checks in the total amount of $2,654.83, it is a matter of simple arithmetic to ascertain that the reconciled balance in petitioner's checking account was $820.88 as of December 31, 1962. In view of the foregoing and since the petitioner has not presented any convincing evidence to support his contention, we sustain respondent on this issue. (Items 3 and 4) State Federal Savings and Loan, Lincoln, Nebraska and First Federal Savings and Loan, Lincoln, Nebraska
For the period ended December 31, 1962, respondent on his net worth schedule shows a balance of $7,100 and $10,100 in petitioner's accounts in the State Federal Savings and Loan, Lincoln, Nebraska and First *94 Federal Savings and Loan, Lincoln, Nebraska, respectively. Respondent contends that these balances are part of a cashier's check in the amount of $24,429.31 which petitioner "misappropriated" from his aunt, Sadie Simon, during the year 1962 and deposited in the aforesaid bank accounts. Essentially, it is respondent's position that after petitioner's maiden aunt, Sadie Simon, sold the Beckham County farm in September 1961 and received a cashier's check in the amount of $24,429.31 she endorsed and transferred it to petitioner who then misappropriated the proceeds thereof, and that under the principles 31 enunciated in James v. United States, 366 U.S. 213 (1961) such funds under section 61(a) are includible in petitioner's gross income for the taxable year 1962. Respondent argues that the accounts in the two savings and loan associations mentioned hereinabove were opened in petitioner's name only; that all withdrawals from those accounts were made by the petitioner; and that "in the absence of a legitimate reason for the petitioner's unrestricted dominion and control over the funds in question, a rebuttable presumption arises that a misappropriation took place." On *95 the basis of the foregoing theory, the respondent determined that $10,000 of the $24,429.31 check in question was ordinary income to the petitioner during the taxable year 1962 and that the remaining $14,429.31 represented the sale proceeds from an interest in the Beckham County farm which Sadie sold. Also, based upon petitioner's statement in a deposition in a civil action, discussed infra, respondent credited him with an $8,000 basis in the Beckham County farm and determined that petitioner realized a long-term capital gain of $6,429.31 from the sale thereof. [4] 32 Petitioner, in opposition, contends that the two aforesaid accounts (Items 3 and 4 of the net worth schedule) should not be included as part of his total assets as of December 31, 1962 in respondent's reconstruction of his gross income for that taxable year because on that date his aunt was still alive and the cashier's check deposited in the two savings accounts under review was intended to be used exclusively as needed for her benefit during her lifetime. In the same vein, *96 petitioner argues that the money in dispute was in effect held in trust for Sadie at the time of deposit and during her remaining life while residing in his home; that after her demise on December 21, 1963 and after all of her outstanding bills were paid the balance of the money in the two bank accounts in question "became a gift" to him. [5] In short, the proper 33 characterization of the transfer of the cashier's check in the amount of $24,429.31 to petitioner during the taxable year 1962 is in dispute. *97 Succinctly, the record shows that the petitioner maintained savings account number X0578 at the State Federal Savings and Loan Assn., Lincoln, Nebraska from October 1962 through December 31, 1965 in the name of Corwin L. Hulbert Motors, Inc., and that said account was opened on or about October 9, 1962 with a deposit of $10,000. Petitioner opened said account with the cashier's check in question. The reverse side of said check was endorsed by Sadie Simon followed by the endorsement of the petitioner. After the $10,000 deposit in savings account number X0578 was made, the remaining $14,429.31 was returned to the petitioner by means of a check payable to the order of Corwin L. Hulbert for that amount. Petitioner also maintained savings account number X5008 at the First Federal Savings and Loan Assn. of Lincoln, Nebraska from October 1, 1962 through December 31, 1965 in the name of Corwin L. Hulbert Motors, Inc. On or about October 10, 1962, petitioner opened savings account number X5008 with the aforementioned check in the amount of $14,429.31. Said account was reduced to a balance of $5.72 on December 31, 1965. 34 We are mindful, of course, that the money in question *98 was deposited in the Corwin L. Hulbert Motors, Inc. accounts (in which Sadie was a stockholder of record dated back to 1953 and in which she was also secretary-treasurer); and that all the withdrawals from these accounts were made only by petitioner. Undoubtedly, in retrospect, a separate bank account for the proceeds of the cashier's check in the names of both Sadie and Hulbert would have cast less doubt on the propriety of his handling of his aunt's funds. However, while the circumstances surrounding the deposit of the money in controversy may at first blush appear suspicious, we must bear in mind that Hulbert was virtually the only relative that she was able to call upon for assistance in her illness and old age. Hulbert took his aunt, who was in poor health, from a rest home in Tulsa, Oklahoma to live with him in Lincoln, Nebraska and he apparently endeavored to conduct her financial affairs in a manner which would cause the least inconvenience and trouble to all concerned. There is no evidence that the deposit of the cashier's check to petitioner's accounts on or about October 10, 1962 was unauthorized by Sadie. Nor is there any convincing evidence that Hulbert appropriated *99 any significant amount of money from these two accounts during her lifetime to pay his personal 35 expenses rather than the cost of caring for his aunt in his home, including her medical expenses and her final bill at the rest home. Likewise, we are cognizant of the fact that after Sadie's demise in 1963, Merle Simon, the Administrator of her estate instituted a civil action against the petitioner in the District Court of Lancaster County, Nebraska in which he alleged in his petition that the petitioner had "appropriated" the $24,429.31 "to his own use under claim of right"; and that after a trail on October 24, 1968 the jury found for the plaintiff and assessed the amount of his recovery at $10,000. Since a transcript of the proceeding, including the judge's instructions to the jury, was not introduced into evidence in the instant case, we do not know the underlying facts which resulted in the jury's verdict. Under the circumstances, we do not find the result in the civil action determinative of the issue before us. We note that petitioner has not characterized the deposits which he made in 1962 to his bank accounts as a legal trust for Sadie, although he described his *100 position as one of a fiduciary in nature. As is frequently the case in loose family arrangements, such as was apparently involved herein, particularly where one or more of the parties are not sophisticated and they are essentially 36 relying on good faith and close familial relationships, legal nomenclature is not employed to delineate the transaction involved. In such circumstances it is incumbent upon the Court, after considering all of the facts, to ascertain what legal relationship the parties actually intended to create by their conduct. Without characterizing the nature of the relationship entered into by Sadie and Hulbert with legal exactitude when she transferred the endorsed cashier's check to him in 1962, considering the record in its entirety, we are convinced that petitioner did not misappropriate the money in question during 1962. It would extend this opinion interminably, and at the same time serve no useful purpose, to analyze all of the arguments pro and con advanced on behalf of petitioner, on the one hand, and respondent on the other. We have examined each of them with meticulous care. Most of the arguments presented on respondent's behalf are either unsound, *101 inconclusive, or based on surmise. Without further elaboration, we hold that the petitioner did not misappropriate the proceeds of the cashier's check during the taxable year 1962, and therefore his net worth should be decreased in the amounts of $7,100 and $10,100 as of the year ended December 31, 1962, representing Items 3 and 4 on the net worth schedule. Our adjusted net worth Schedule II will reflect this holding. 37 (Item 6-1) Nebraska Farms Under the designation Real Estate on the net worth schedule, respondent included Item 6-1 Nebraska Farms which shows 80 acres having a cost basis of $6,000 for the taxable years beginning January 1, 1962 and 1965; and 60 acres having a cost basis of $1,000 as of January 1, 1965. Respondent determined that the petitioner's adjusted cost basis in the Saunders County real estate [6] at the time it was sold in September 1965 was $13,303.45. In computing said basis respondent calculated the basis of the two parcels involved to be $6,000 each plus $1,303.45 for a selling fee, revenue stamps and abstracting cost.Petitioner, in opposition, contends that the 80-acre parcel cost $7,800 and the 60-acre parcel $6,000; and further, that in determining *102 his adjusted cost basis in the Saunders County farm respondent failed to include petitioner's costs amount in excess of $5,000 to improve the property. Petitioner also contends that the Kaiser automobile which he traded in part to Henry J. Benes in 1953 for 80 acres of the Saunders County farm had a fair market value of $3,000 rather than the $1,200 used by respondent. 38 The record shows that on July 4, 1953, the petitioner acquired 80 acres of Saunders County land from Benes by paying him $4,800 cash and tendering him a 1949 Kaiser demonstrator car that had been titled in the Corwin L. Hulbert Motors, Inc. name. With respect to the cost of the 80 acres in controversy, petitioner argues that the land had a "value" of $7,800 because he had obtained a loan in the amount of $3,900 from the John Hancock Mutual Life Insurance Co. using the land as collateral and ordinarily the company will lend up to 50 percent of the appraised value of the land. While such may be the case, we are not concerned here with the value for loan purposes. Petitioner, who bears the burden of proof, has not adduced *103 any affirmative evidence as to the cost of the 80 acres under review. It has been stipulated that the purchase price for the second portion of the Saunders County farm was $6,000. Petitioner acquired the Saunders County property which he owned during the years involved herein in two parcels. The first portion was acquired from Benes during the year 1953 for a total consideration of $6,000. Benes agreed to accept $4,800 in cash and a 1949 Kaiser automobile in full payment of the agreed upon purchase price. Benes testified in a forthright and unequivocal manner concerning the terms of 39 the sale and we have no reason to question his testimony. Moreover, we must reject petitioner's argument that the respondent failed to introduce the National Auto Dealers Assn. (NADA) guide at the instant trial as evidence of its value at the date of the trade for the farm. Ostensibly, the burden of proof is on the petitioner with respect thereto and we are not persuaded by his uncorroborated testimony, that the automobile was worth $3,000 instead of the $1,200 used by respondent. We are satisfied that the amount of $1,200 used by respondent for the automobile was part of the agreed upon *104 consideration arrived at after arm's-length bargaining. In our view, it is immaterial that the fair market value of the automobile may have differed to some extent from the price agreed upon by the petitioner and Benes. Considering the evidence before us and particularly the testimony of Benes, we find no reason to alter the valuation used by respondent. We reject petitioner's contention that respondent, in determining the adjusted cost basis in the Saunders County farm failed to include several thousand dollars ($5,615) for improvements to the property. Petitioner claims that during 1954 he spent $1,265 for seeding 80 acres and in the spring of 1965 he spent $3,000 for "Blue stem seeding" of some of the other tillable land; $1,200 for terracing; $2,000 for a watering pond; $1,000 40 for fencing; and $150 for 10 swarms of bees and hives to pollenize the alfalfa, vetch and sweet clover. Petitioner's brother, an accountant, estimated that the fence cost about $800 to $1,000; however, petitioner produced no sales slip, canceled check or other documentary evidence to substantiate the purchase of materials which might be used in constructing a fence. The record is not clear *105 as to the time that the fence was allegedly erected, but none of the depreciation schedules on petitioner's 1962 or 1965 Federal income tax returns reflect a fence of the type that he allegedly placed on the property. Assuming arguendo that the petitioner did in fact construct a fence, the absence of such an item on the depreciation schedules of his tax returns for the years in issue leads us to believe that he either deducted the cost of the fence from his gross income in the year in which it was constructed, or it was fully depreciated prior to the beginning of the taxable year 1962. In any event petitioner has not demonstrated that his basis in the property was greater than the amount determined by the respondent. Our conclusions are the same regarding the alleged costs of terracing and seeding the property. Likewise as to the watering pond, petitioner produced no documentary evidence of the cost of the alleged pond. The depreciation schedule (Schedule F) on petitioner's income tax return 41 for 1965 reflects a watering pond which was constructed during 1963 at a cost of $211.01, but the petitioner did not assert that the pond reflected on said return was located on his *106 Saunders County property (he also owned a farm in Coffey County, Kansas). In short, the petitioner has not established that the basis in his Saunders County property should be greater than the amount determined by the respondent. Accordingly, we sustain respondent on this issue. (Item 8-b) Reserve for Depreciation Respondent listed the addresses and cost basis of nine parcels of real estate owned by petitioner in Lincoln, Nebraska during the taxable years involved under Real Estate, Item 6-a to i, inclusive, on the net worth schedule. Under Liabilities and Reserves (Real Estate), Item 8-b, respondent also set forth the amounts of "Total Reserves for Depreciation" for the taxable years under review. Respondent determined that petitioner's basis of the eight lots on which his one-family residential dwelling units were located was $1,000 per lot during the taxable period involved. [7] Petitioner, on the other hand, urges 42 that the value of the eight lots averaged $300 per lot in 1962 because none of them was in the better neighborhood of Lincoln, Nebraska and all of them were obtained under depressed circumstances of bankruptcy or foreclosure. Petitioner's brother, Donald *107 B. Hulbert, testified that the reserve for depreciation on the net worth schedule should be increased in the amount of $218.68 as of December 31, 1962 (that is, added to $13,146.91) because respondent's allocation of petitioner's basis in each of the eight residential lots in question was excessive. Apparently, the intended result of petitioner's position was to increase his basis in depreciable property and thereby increase his reserve for depreciation for both of the taxable years involved. Neither the petitioner nor his brother explained the steps taken to compute the $218.68 adjustment which they have asserted. Bearing in mind that this is a net worth case, if the petitioner's reserve for depreciation as of the beginning of 1962 should also have been adjusted by $218.68 the net effect on his increase in net worth during 1962 would be zero. The petitioner's naked assertions regarding the value of the lots and his unexplained computation of the $218.68 figure are not sufficient to rebut respondent's presumption 43 of correctness. Petitioner, on brief, *108 alleges that on March 14, 1961 he purchased a 2-foot strip of land from E. A. Hepner for $15, which was situated between Lincoln High School and 2115 H Street in Lincoln, which gave the property known as 2115 H Street (Item 6-c on the net worth schedule) a frontage of 35 feet. Using the price paid for the 2-foot strip of property at $5 per foot as a guide, petitioner valued the entire lot at 2115 H Street at $250 and the lots at 114 L Street (Item 6-g of the net worth schedule) and 132 L Street (Item 6-h of the net worth schedule) at $100 each. Apart from his testimony in this connection petitioner did not introduce any supportive evidence with respect to the transactions involving the purchase of the eight lots in dispute. We do not believe that the price allegedly paid for a narrow 2-foot strip of land adjacent to the high school is a reliable index of the fair market value of large parcels of land in the environs of the lots in question with usable characteristics. Moreover petitioner, who has the burden of proof, did not introduce into evidence any tax bills or documents from the City of Lincoln for the years in which the properties in question were acquired by him which would *109 probably reflect the separate assessed valuation assigned to the lot and improvements thereon from which we could ascertain the approximate valuation of each of the lots involved herein. 44 We are not obliged to accept the testimony of the taxpayer as to the value of the lots in controversy even though the respondent did not present any witness to rebut his testimony. Lakewood Manufacturing Co. v. Commissioner, 453 F.2d 451, 454 (C.A. 6, 1972). During the years in issue the population of Lincoln, Nebraska, was in excess of 128,000. Although the rental properties that the petitioner owned during the taxable years involved were not choice locations, considering the meager evidence adduced by petitioner, we believe that $1,000 per lot appears reasonable for any residential lot in a city of that size. In the absence of any cogent evidence to the contrary, we must uphold respondent on this issue. (Item 10-c) Life Insurance Company Loans Payable As of January 1, 1962, December 31, 1962, January 1, 1965, and December 31, 1965, the petitioner owned six ordinary life endowment insurance policies which had been issued to him by the John Hancock Mutual Life Insurance *110 Co. It has been stipulated that the aggregate outstanding balances on the policy loans which were granted to petitioner on those six policies amounted to $6,928.24, $7,634.34, $9,634.43, and $9,662.68 as of January 1, 1962, December 31, 1962, January 1, 1965, and 45 December 31, 1965. Respondent determined that the outstanding balances on the policy loans which had been granted to petitioner by the John Hancock Mutual Life Insurance Co. on all policies that had been issued to him by said company were in the aforesaid amounts as reflected on the net worth statement under Item 10-c. Petitioner contends that the outstanding balance on his insurance policy loans as of January 1, 1962 was in the aggregate amount of $20,119.08 whereas respondent's balance of such loans on his net worth schedule is $15,575.69, or a difference of $4,543.39 in the understated liabilities as of the start of the net worth period. In support of his position, petitioner alludes to several insurance policies which he urges belonged to him during the taxable period involved and on which he received loans; and that respondent failed to include such loans in his reconstruction of petitioner's liabilities *111 for the net worth period. Thus, petitioner contends that Policy No. 4656800 issued by John Hancock Mutual Life Insurance Co. on the life of Corwin C. Hulbert, "Juvenile" and Corwin L. Hulbert was not considered by respondent in computing petitioner's liability for policy loans. Petitioner argues that under the terms of the policy he was actually the owner of said policy until 46 his son, Corwin C. Hulbert became 21 years of age in 1969. Examination of the loan record pertaining to the policy in question shows that there was a loan placed on the policy on March 14, 1959 in the amount of 281.85 and that on January 18, 1963, the loan had been increased to $354.24 and there was no credit for repayment on the loan until May 14, 1971. On January 18, 1963 a loan to pay the premium on the policy in the amount of $31.95 was made to the policyholder by a so-called automatic premium loan (A.P.L.) which prevents the policy from lapsing for lack of payment of premium as long as there is any cash value in the policy. Said loan of $31.95 was to pay the premium for the previous 6 months of 1962. Similarly, a loan of $27.24 dated July 16, 1965 was shown on the aforesaid loan record as taken *112 from A.P.L. and from dividends paid by the insurer in 1965. The balance of the loan account as of December 31, 1965 was $544.43. Said amount was borrowed from the policy against the cash value to pay the premium on January 18, 1963 and is shown under A.P.L. Petitioner testified that he paid the premium of $62 during the taxable year 1965. We are satisfied from all of the evidence that petitioner was for purposes of income taxation the owner of Policy No. 4656800 during the years involved and that the aforesaid loans in the 47 amounts of $31.95 and $27.24 were granted to petitioner during 1963 and 1965, respectively. The amount of life insurance company loans payable on our adjusted net worth schedule will be increased accordingly. Likewise, since petitioner paid the premium in the amount of $62 in 1962, we must increase his personal living expenses in that amount for the taxable year 1962 on our adjusted net worth statement, which will result in an increase in his understatement of adjusted gross income for each of the taxable years involved herein. Petitioner further contends that Policy No. 4012429 was issued on his life and that of his daughter, Almarie R. Hulbert, *113 "Juvenile" in 1945; that they were jointly insured until Almarie became 21 years of age at which time she would become the sole owner of the policy; and that during the taxable years involved he was for all intents and purposes the owner of said policy. Petitioner introduced a company record (of John Hancock Mutual Life Insurance Co.) of the policy in question showing that a loan of $320.48 was made to him and Almarie on March 8, 1963 and on April 14, 1965 there was a loan in the amount of $392.49. The annual premium was $49.96 which he paid. Said record shows that no policy loans were issued to the owner of said policy during the taxable year 1962. A loan of $24.86 was granted 48 to the policyholder on April 14, 1965. Petitioner, on brief, avers that the A.P.L. was used to pay the premium on April 14, 1965 in the amount of $24.86 along with dividends being used to pay the balance of the premium; and that no money was advanced by him, but was borrowed from the cash value of the insurance policy to pay the premium due under the A.P.L. plan and use of dividends. Again, we are persuaded that petitioner was in fact the owner of Policy No. 4012429 for income tax purposes; that *114 he personally received the loans in question; and that such loans were includible in his liabilities for the taxable year 1965 in the net worth statement. Since the payment of the premium in 1965 was made with the A.P.L. and therefore petitioner did not actually disburse any of his own funds, it is not necessary to increase his personal living expenses in the amount of the premiums for the taxable year 1965. However, our adjusted net worth schedule will reflect the increase of $24.86 in life insurance company loans payable as of December 31, 1965. Petitioner also contends that he was the sole owner of Policy No. 3002619 during the taxable years involved herein; that he received a loan on said policy in the amount of $1,331.28; and that after the divorce decree on February 23, 1965, he assigned ownership of the policy 49 to his former wife, Verna. Apart from his general testimony regarding said policy, no affirmative evidence was introduced by petitioner to support his contention. Likewise, Hulbert, on brief, alluded to several insurance policies on which loans purportedly were made to him and which had outstanding loan balances in the total amount of $934.04 for the taxable *115 years 1962 and 1965. One of these policies was No. 9403970 issued by Massachusetts Mutual, Springfield, Massachusetts. Absent any other corroborative evidence, we hold that petitioner has not established that he received the amount of the loans allegedly made on such policies or that he had the liability to repay such money during the taxable years involved. (Item 11) Real Estate Taxes - Payable On the net worth schedule under Liabilities and Reserves respondent shows an Item 11 designated as "Taxes-Payable" to reflect his determination that as of December 31, 1962, January 1, 1965, and December 31, 1965, the petitioner was liable for unpaid real estate taxes in the respective amounts of $432.27, $262.53 and $380.11, and capitalized such taxes in computing petitioner's net worth for the taxable period involved herein. 50 In determining petitioner's basis in the residential property which he acquired or was attempting to acquire during the years 1962 through 1965, the respondent increased petitioner's basis by the amount of real property taxes, if any, which he assumed in making those purchases but had not paid as of the close of the respective years. It is respondent's *116 position that such action was necessary if the petitioner was to be allowed the full amount of depreciation to which he was entitled. However, petitioner was a cash basis taxpayer during those years and respondent's action increased the petitioner's assets although no cash expenditure had been made by him. To avoid distorting petitioner's net worth, the respondent computed the taxes payable mentioned hereinabove. The taxes payable under Liabilities and Reserves on the net worth schedule offset the corresponding increase in assets. Hulbert has not presented any evidence to rebut respondent's determination. Petitioner, on brief, argues that on June 20, 1965 he paid by check (no. 914) the amount of $470.42 for taxes levied for the fiscal years 1964-65 by Coffey County, Kansas on his farm and that he is entitled to a credit in said amount in the year paid, that is 1965, which respondent did not allow. In support of his argument petitioner introduced his "Official Receipt 51 1965 Tax" which reflects total 1965 taxes paid on land which is described in terms of lot and block. We find this documentary evidence to be immaterial to respondent's determination. Hulbert has apparently *117 overlooked the fact that respondent's net worth schedule is a reconstruction of his adjusted gross income for the taxable years involved. Consequently, the payment of taxes on his rental properties (3108 North 56th Street, 2325 South 10th Street, and 132 L Street) were either expressly or implicitly considered in reconstructing his adjusted gross income. Section 62(1) of the 1954 Code. Since petitioner is a cash basis taxpayer, the respondent properly determined that the current real property taxes on petitioner's Kansas farm which remained unpaid as of December 31, 1965, should not be reflected as a liability on the net worth schedule in arriving at his adjusted gross income. To do otherwise would have the effect of giving Hulbert a deduction during the taxable year 1965 for taxes that were not paid until 1966. It is well settled that a cash basis taxpayer is not entitled to a deduction for current taxes until the year they are actually paid. Eugene Vassallo, 23 T.C. 656, 664 (1955). Under the circumstances, we will not distrub respondent's determination on this issue. 52 (Item 15-a) Personal Living Expenses Respondent, on his net worth schedule under *118 Item 15-a, determined that the petitioner's total living expenses for the taxable years 1962 and 1965 were $3,506.88 and $3,122.24, respectively. Hulbert did not testify regarding his personal living expenses. However, he contends, on brief, that his personal living expenses for those years were in the respective amounts of $2,210 and $1,200. Petitioner maintains that he had no money to spend during the years involved except for the "bare necessities." In this connection, he avers that from January 1, 1965 to August 1, 1962, he lived with his family, consisting of six people, at home at a cost of $230 per month, and that he did not have to pay rent or for utilities. He states further that he lived at 114 L Street in Lincoln from August 1, 1962 to December 31, 1962 at a cost of $600; and that he did not spend any money for recreation, clothes or mechanical repairs to his automobile. Petitioner further asserts that during 1965 he lived at 114 L Street in Lincoln for a total expenditure of $1,200, which included utilities, laundry, food, telephone and automobile expenses. It suffices to say that we find Hulbert's claims on brief without supportive evidence and insufficient to overcome *119 the presumptive correctness of respondent's determination. 53 Petitioner's brother made some general statements at the trial to the effect that the expenses in question exceeded the petitioner's actual expenditures. However, on cross-examination he conceded that he had no personal knowledge of what those expenses might have been. Under the circumstances, respondent is sustained on this issue. (Items 15-e) Lump Sum Property Settlement On his net worth schedule under Item 15-e respondent shows a lump sum property settlement in the amount of $15,403.08 as of the taxable period ending December 31, 1965. Respondent determined that petitioner's payment of $15,403.08 during the taxable year 1965 to the clerk of the District Court for Lancaster County, Nebraska, constituted a lump sum property settlement rather than alimony within the meaning of section 71 of the 1954 Code, [8] 54 and hence, was not deductible by him in that year. Essentially, it is respondent's position that the $15,403.08 in controversy was not a periodic payment but a single lump sum for the sole purpose of satisfying the legal obligation to his former spouse, Verna A. Hulbert, imposed upon him by the *120 divorce decree dated February 23, 1965. Petitioner contends that he sold the Saunders County farm voluntarily in order to "complete alimony payments" of $15,000; but that such payment was not made as a division of property or necessarily a lump sum payment and therefore he was entitled to deduct said amount during 1965. Our issue is simply whether or not the $15,403.08 was a periodic payment. *121 Analysis of the divorce decree reveals that Verna A. Hulbert was awarded "the sum of $15,000 alimony to be paid to plaintiff by the defendant forthwith" and said 55 amount was to constitute a lien on his property until fully paid. Although the decree contains the word "alimony", we believe the import thereof is to effect a division of property between the petitioner and his former wife promptly or without delay. Divorce settlements or decrees often provide some considerable amount payable immediately to the wife, in addition to regular or recurring payments for support of children, if any, thereafter. Manifestly, the $15,000 is not a periodic payment. In Ralph Norton, 16 T.C. 1216 (1951), affd. 192 F.2d 960 (C.A. 8, 1951), in which the divorce decree provided that the husband was to pay his former wife the sum of $5,000 "as additional alimony, payable forthwith," and the issue was whether or not the $5,000 was a periodic payment or a lump sum property settlement within the purview of section 22(k) of the 1939 Code (the predecessor of section 71, supra ), we held that the payment in question was in the nature of a division of capital, rather than *122 from the husband's income and therefore was not deductible by him. It is immaterial, in our view, that petitioner of his own choosing sold the Saunders farm as a means of obtaining the $15,000 required to satisfy the terms of the divorce decree. The obligation was specified in 56 terms of money, payable without delay, and without any directive as to how the $15,000 was to be obtained. We believe that the payment in controversy was made out of petitioner's capital rather than from his income and clearly constituted the discharge of a lump sum property settlement, rather than alimony. Therefore, petitioner is not entitled to deduct said payment from his income under section 71, supra, during the taxable year 1965. See Joseph D. Fox, 14 T.C. 1131, 1135 (1950). Respondent's treatment of the lump sum payment in his net worth schedule is sustained. Livestock Loss Deduction ($5,141.18) Respondent determined that the petitioner is not entitled to a loss deduction of $5,141.18 for livestock which allegedly perished in a snow storm during the taxable year 1965. Petitioner contends that he purchased 11 head of cattle during 1964 for $1,368 which perished on March 1, 1965, and *123 that he is entitled to a loss deduction in the amount of $5,141.18, which he claimed on his 1964 income tax return. Petitioner maintains that the alleged loss should have been considered in reconstructing his net worth. The record shows that the petitioner deducted the cost of all cattle which he purchased in 1964 as a 57 current expense for that year. Revenue agent Roper attempted to verify the expense of $5,141.18 claimed on Schedule F of petitioner's 1964 income tax return; and in so doing he made a schedule of all of the checks for cattle purchases that were supplied to him by the petitioner's accountant. By working in that manner Roper was able to verify $5,082.68 of the amount claimed as a current expense on petitioner's 1964 return. Two of the three checks which petitioner introduced into evidence to substantiate the alleged loss could be traced to the aforementioned schedule compiled by Roper. In view of Roper's investigation of petitioner's cattle purchases for 1964, it is clear that if in fact some of the petitioner's cattle died during 1965, their cost had already been deducted as an expense in 1964. We believe that petitioner misconceives the nature of a net *124 worth reconstruction of income. As this Court recently pointed out in Sophie Bedeian, 54 T.C. 295, 299 (1970), "The term "net worth" * * * does not mean the economic affluence of the taxpayer, * * *. The reference is to the tax basis of an asset, not to its fluctuating market value." Having fully deducted the cost of the cattle in 1964, the tax basis in those assets was zero 58 at the beginning of 1965, the tax basis was also zero at the time the cattle were alleged to have been lost in a snow storm, and the tax basis was zero at the end of 1965. In these circumstances, any adjustment by the respondent of the petitioner's 1965 net worth would have been inappropriate and in effect would have permitted petitioner to receive a double tax benefit. Loans Payable to John McArthur Petitioner contends that he received a personal loan from his attorney, John McArthur, in the aggregate amount of $600 during the taxable year 1965, which remained unpaid as of December 31, 1965; and that respondent failed to decrease his net worth as of December 31, 1965, in that amount. In support of his position petitioner introduced into evidence three checks in the aggregate amount *125 of $600 which had been given to him by McArthur. The checks were written in January, April and December in the respective amounts of $50, $300 and $250. The documentary evidence does not sustain petitioner's contention. During his investigation of Hulbert's tax returns for the taxable period involved herein revenue agent Roper observed two checks from Hulbert to McArthur in the amounts of $150 and $300 which were written during 1965, and Roper treated those checks as loan repayments. 59 In examining Hulbert's cancelled checks for 1965 and 1966 Roper did not find any check in the approximate amount of $250. Hulbert, on brief, maintains that the aforesaid checks in the respective amounts of $150 and $300 payable to McArthur were for services and not repayment of loans. In view of Roper's investigation it is clear that if the $300 and $150 checks were in fact loans to the petitioner they were repaid prior to December 31, 1965. Hulbert has not established to our satisfaction that the $250 check was in fact a loan, or if it was a loan, that it was not repaid on or before the last day of 1965. In light of the foregoing, we hold for respondent on this issue. Likewise, petitioner *126 on brief, contends that respondent failed to allow him credit on his net worth schedule for deposits to the checking account of Corwin L. Hulbert Motors, Inc. number XXX-XX7-704 at the National Bank of Commerce, Lincoln, Nebraska, during the entire year 1962 by the other stockholders of the corporation in the total amount of $6,476.34. We find that petitioner's contention is without merit. It is stipulated that respondent made adjustments to the petitioner's gross income for the taxable year 1962 in the amount of $12,945.91 and one of the 60 adjustments was a credit of $1,315 representing social security payments to petitioner's father and Sadie Simon which were deposited to the aforesaid checking account during the taxable year 1962. Petitioner has not adduced any evidence to show that money belonging to any other stockholders of Corwin L. Hulbert Motors, Inc. was deposited in said account during the taxable year involved. Self-Employment Tax ($77.09) Respondent determined that the petitioner is liable for self-employment tax in the amount of $77.09 for the taxable year 1965 in addition to the self-employment tax liability reported on his Federal income tax return for *127 that year. On Schedule F-1 of his Federal income tax return for the taxable year 1965, petitioner reported self-employment income in the amount of $3,372.38 and liability for self-employment tax in the amount of $182.11. The self-employment tax reported on his 1965 return was assessed and subsequently collected from the petitioner, together with statutory interest which had accrued until the date of payment.
During the investigation of petitioner's income tax affairs for the taxable year 1965 respondent determined that the petitioner realized self-employment income in 61 addition to that reflected on his income tax return for 1965. On Schedule 1 attached to the statutory notice of deficiency the respondent credited petitioner with the self-employment tax ($182.11) reported on his 1965 return, but asserted that he was liable for an additional $77.09 of self-employment tax for the taxable year 1965. During the trial petitioner offered no evidence to refute respondent's determination. Consequently, respondent is sustained on this issue. Addition to Tax ( Sec. 6651(a), I.R.C. 1954) Respondent determined that petitioner's failure to timely file his Federal income tax *128 returns for the taxable years 1962 and 1965 was not due to reasonable cause and determined an addition to tax under section 6651(a) of the 1954 Code. Hulbert contends that a "working copy" of his income tax return for 1962 was prepared by Vance B. Noel (owner of Business Control Co. which was in the business of preparing income tax returns for the public) and after reviewing the return on December 28, 1962, Hulbert signed a blank Form 1040 with Noel's assurance that the completed return would be mailed the next day. However, said return was not received by respondent until January 29, 1965. Likewise, in 1966 a "working copy" 62 of Hulbert's return was prepared by Noel; and again Hulbert, on April 8, 1966, allegedly signed a blank return for 1965 with the understanding that Noel would mail it the following day. Said return was received by respondent on August 12, 1966. It is petitioner's position that Business Control Co. had been recognized as a competent firm; that he had given Noel ample time in which to prepare and mail said returns; and therefore petitioner was blameless in filing the delinquent returns. Assuming that petitioner relied on his accountant to prepare his *129 returns, such reliance under the facts of record does not shield him from the liability imposed by section 6651(a), supra. It has been held that the negligent failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file. Logan Lumber Co. v. Commissioner, 365 F.2d 846, 854 (C.A. 5, 1966). Accordingly, respondent's determination is upheld. Addition to Tax ( Sec. 6653(a), I.R.C. 1954) Respondent determined that petitioner's underpayment of his Federal income taxes for the taxable years 1962 and 1965 was due to negligence or intentional disregard of the rules and regulations. The petitioner did not maintain adequate books and records to enable him to compute his taxable income for the taxable years involved, as is evident 63 from the respective amounts by which he understated his taxable income for each of those years. Such conduct is an obvious intentional disregard of rules and regulations. Furthermore, petitioner presented no evidence with respect to the addition to the tax under section 6653(a), supra. Therefore, this issue must be decided for the respondent. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Pursuant to the agreement of the parties the Court ordered that those facts and exhibits as set forth in respondent's proposed stipulation of facts, with modifications as appear in the transcript of the proceedings, be accepted as established facts herein. ↩
*. Some of the basis figures for the residential properties include the cost of major appliances which the petitioner placed in those respective rental units. ↩
3. Paragraph 3 set forth hereinabove was in handwriting and was written above the typewritten lines of the following paragraph which was crossed through: 3. That thereafter the said Sadie Simon delivered the proceeds from the sale of said real estate to the defendant Corwin L. Hulbert, her nephew, for safekeeping and to hold in trust for her. That the exact date of the latter transaction is unknown to the plaintiff, but well known to the defendant. That said funds so received by the defendant constituted trust funds to which the plaintiff is rightfully entitled as Administrator of the Estate of Sadie Simon, deceased. That the said defendant has denied that he holds the said funds or that they are rightfully the property of the said Sadie Simon Estate. There is nothing in the record to explain the circumstances under which paragraph 3, as typewritten, was crossed through and the handwriting inserted in lieu thereof. ↩
*. Some of the basis figures for the residential properties include the cost of major appliances which the petitioner placed in those respective rental units. ↩
4. During the instant trial petitioner testified that he had no property interest in the Beckham County farm at the time it was sold. ↩
5. When petitioner's brother, Donald B. Hulbert, asked him what his contention was as to the nature of the cashier's check, petitioner testified: "This cashier's check - my aunt - it was a gift to me, and it was used for expenses as long as she was living, and when she passed on I was to have what was left." Then, when asked by his brother what the money was used for he testified: "It was used for keep. In other words, for both of us, along with my father, to live on and get along with." Later, petitioner amplified his testimony by stating that prior to Sadie's death, she did not make a gift of the money in question to him; but that he "was supposed to have this money when she passed on, * * * but - if she lived 10 years, fine. If she lived five years, fine, whatever was left." ↩
6. Apparently the Nebraska Farm is also known as the Saunders County real estate. ↩
7. The basis of 2901 North 11th Street, 3021 T. Street, and 1727 South 27th Street was not contested by respondent. ↩
8. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule. - (1) Decree of divorce or separate maintenance. - If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation. * * * (c) Principal Sum Paid in Installments. - (1) General Rule. - For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments. ↩